# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE CIRILLO FAMILY TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 10116-CB |
| | ) | |
| ARAM MOEZINIA, LEWIS TEPPER, | ) | |
| MARK WALTER, and DAVA | ) | |
| PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 3, 2018
Date Decided: July 11, 2018

David A. Jenkins, Neal C. Belgam, and Clarissa R. Chenoweth of SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; *Attorneys for Plaintiff*.

A. Thompson Bayliss, Adam K. Schulman, and E. Wade Houston of ABRAMS & BAYLISS, LLP, Wilmington, Delaware; Richard W. Reinthaler of WINSTON & STRAWN, LLP, New York, New York; *Attorneys for Defendants*.

**BOUCHARD, C.**

This action arises out of the acquisition of defendant DAVA Pharmaceuticals, Inc. by an affiliate of Endo Pharmaceuticals, Inc. in August 2014. Before the merger, DAVA was a closely-held corporation with thirty-one stockholders.

To expedite consummation of the merger, DAVA's longtime outside legal counsel suggested that it obtain stockholder approval of the merger by written consent under Section 228 of the Delaware General Corporation Law. DAVA pursued this route. It quickly obtained written consents from its nine largest stockholders that collectively held over 95% of the Company's common shares, each of whom also signed the merger agreement. Shortly thereafter, DAVA obtained written consents from all of its other stockholders except the plaintiff in this case, The Cirillo Family Trust, which held approximately 0.27% of DAVA's shares as of the date of the merger.

When it became apparent that the Trust would not provide a written consent approving the merger, DAVA sent the Trust a notice stating that the merger had been approved by a majority of DAVA's stockholders and providing information about how to seek appraisal of its shares. The notice contained two undisputed legal deficiencies. First, the statement in the notice that DAVA had obtained stockholder approval of the merger technically was inaccurate because the written consents of the nine largest stockholders were not dated properly, rendering them invalid under Section 228 as it was written at the time. Second, the notice did not contain legally

required information that would allow a stockholder to make an informed decision whether to pursue appraisal.

In September 2014, one month after the merger closed, the Trust filed suit. As amended, the Trust's complaint asserts two claims. Count I seeks rescissory damages against DAVA and its directors because of defects concerning the dating of certain written consents. Count II asserts that DAVA's directors breached their fiduciary duties because the notice failed to include information material to a stockholder's determination whether to accept the merger consideration or to seek appraisal of its shares. DAVA asserts a counterclaim asking the court to validate and declare effective certain written consents, under Section 205 of the Delaware General Corporation Law, to remove any question that the merger obtained the requisite stockholder approval.

Before the court are two motions: defendants' motion for summary judgment dismissing the amended complaint in its entirety and granting judgment in DAVA's favor on its counterclaim, and the Trust's motion to amend its complaint for a second time. For the reasons explained below, defendants' motion for summary judgment will be granted because (i) stockholder approval of the merger will be validated under 8 *Del. C.* § 205, and (ii) the undisputed factual record shows that DAVA's directors reasonably relied, in good faith, on the advice of outside legal counsel with respect to the preparation of the notice even though, unbeknownst to the directors,

2

that advice was seriously flawed. For essentially the same reasons warranting entry of summary judgment in defendants' favor, the Trust's motion to amend will be denied except in one limited respect.

## I.    BACKGROUND

The facts recited herein are based on facts pled in the Verified Amended Class Action Complaint (the "Amended Complaint")[1] that are not in dispute, as well as documents, deposition testimony, and affidavits submitted by the parties in connection with defendants' motion for summary judgment.

### A.    Parties and Relevant Non-Parties

DAVA Pharmaceuticals, Inc. ("DAVA" or the "Company") was a generic pharmaceutical manufacturer headquartered in New Jersey and incorporated in Delaware.[2] In August 2014, DAVA merged with an affiliate of Endo Pharmaceuticals, Inc. ("Endo"), which resulted in the Endo affiliate acquiring all of the outstanding shares of DAVA's stock (the "Merger").[3] Before the Merger, DAVA was a closely-held corporation with thirty-one stockholders.[4] Since the

---

[1] Dkt. 22.

[2] Am. Answer ¶¶ 3, 6 (Dkt. 88).

[3] Am. Answer ¶ 7.

[4] Am. Answer ¶ 8; Transmittal Aff. of Adam K. Schulman in Supp. of Opening Br. in Supp. of Defs.' Renewed Mot. for Summ. J. ("Schulman Aff.") Ex. 16 (Dkts. 125-27).

Merger, DAVA has been operated as a wholly-owned, indirect subsidiary of Endo called DAVA Pharmaceuticals LLC.[5]

Plaintiff The Cirillo Family Trust (the "Trust") is a former stockholder of DAVA that allegedly held 1,626 shares, or 0.27%, of the Company's common stock as of the Merger.[6] Non-party Anthony Cirillo is the trustee of the Trust.

Defendants Aram Moezinia, Lewis Tepper, and Mark Walter (the "Director Defendants") were the three members of DAVA's board of directors at the time of the Merger.[7] Moezinia was one of the founders of DAVA, served as an officer and director of the Company from its inception until the Merger, and was the Company's President at the time of the Merger.[8] Tepper served as the Company's General Counsel from its inception until the Merger and became a director in 2013.[9] Walter is the Chief Executive Officer of Guggenheim Capital Company, LLC, which was an original investor in DAVA.[10] Walter did not attend all of the Company's board

---

[5] Am. Answer ¶ 7; Dkt. 172 at 5 n.6.

[6] Am. Compl. ¶ 2.

[7] Am. Answer ¶ 3.

[8] Schulman Aff. Ex. 23 (Moezinia Dep.) at 34, 41; Aff. of Aram Moezinia in Supp. of Defs.' Renewed Mot. for Summ. J. ("Moezinia Aff.") ¶¶ 1-2 (Dkt. 125).

[9] Schulman Aff. Ex. 25 (Tepper Dep.) at 12-13; Aff. of Lewis M. Tepper in Supp. of Defs.' Renewed Mot. for Summ. J. ("Tepper Aff.") ¶¶ 1-2 (Dkt. 125).

[10] Schulman Aff. Ex. 23 (Moezinia Dep.) at 35; Ex. 24 (Walter Dep.) at 23.

meetings when he was a director and allowed a fellow Guggenheim executive, John Griffin, to act as his proxy at certain board meetings.[11]

## B. Events Preceding DAVA's Exploration of Strategic Options in 2013

DAVA was founded in 2004.[12]  On February 3, 2006, DAVA obtained a loan from Wachovia Bank, National Association.[13]  DAVA defaulted on the Wachovia loan when it came due in 2007 or 2008,[14] but Wachovia worked with DAVA for a period of time to continue to carry the loan.[15]

In early 2012, when Wachovia began to get "antsy" about carrying its loan to DAVA further, DAVA's-then directors approached some of their contacts about taking it over.[16]  In late December 2012, an entity called HLAM5 Pharma Investors LLC purchased the Wachovia loan for $22.5 million, a discount to its outstanding balance of approximately $49.3 million (the "Debt Purchase").[17]  Soon after the Debt

---

[11] *Id.* Ex. 24 (Walter Dep.) at 15.

[12] Tepper Aff. ¶ 2.

[13] Transmittal Aff. of David A. Jenkins to Pl.'s Answering Br. in Opp'n to Defs.' Renewed Mot. for Summ. J. ("Jenkins Aff.") Ex. 4 at DAVA037538 (Dkts. 137-38).

[14] Schulman Aff. Ex. 25 (Tepper Dep.) at 35-36.

[15] *Id.* Ex. 25 (Tepper Dep.) at 36-37.

[16] *Id.* Ex. 23 (Moezinia Dep.) at 53-54.

[17] Jenkins Aff. Ex. 3 at DAVA003708; Ex. 4.

Purchase, a number of other entities were assigned interests in the Wachovia loan (together with HLAM5 Pharma Investors LLC, the "New Lenders").[18]

As part of the Debt Purchase, DAVA was required to negotiate with the New Lenders concerning the restructuring of the Wachovia loan.[19]  As a result of these negotiations:  (i) the Wachovia loan was restructured so that it was no longer in default, although the principal was not reduced;[20] (ii) the New Lenders were issued warrants, effective January 17, 2013, to purchase 50% of DAVA, on a fully diluted basis (the "Warrants");[21] and (iii) the New Lenders received a $1 million payment up front.[22]

The Trust contends that some of the Warrants were issued to DAVA's directors at the time and/or entities affiliated with them.  On November 8, 2013, in response to a request from Cirillo, Tepper sent Cirillo the Company's financial statements for 2011 and 2012, which disclosed the issuance of the Warrants but did not disclose the details of who received them.[23]

---

[18] *Id.* Ex. 3 at DAVA003708; Ex. 5 at P-139; Ex. 6; Schulman Aff. Ex. 23 (Moezinia Dep.) at 58-64.

[19] Schulman Aff. Ex. 25 (Tepper Dep.) at 80-81.

[20] *Id.* at 80, 84.

[21] *Id.* at 83; Jenkins Aff. Ex. 8.

[22] Jenkins Aff. Ex. 8.

[23] Transmittal Aff. of Adam K. Schulman in Supp. of Reply Br. in Supp. of Defs.' Renewed Mot. for Summ. J. ("Schulman Reply Aff.") Exs. 3, 4 at P-00411-12 (Dkts. 142-43).

Sometime later in 2013, to protect certain DAVA employee-stockholders from dilution from the Warrants, the DAVA board of directors granted them a number of stock options (the "Stock Options").[24] Most (58,425.41) of the 77,069 Stock Options granted in 2013 went to Tepper.[25]

## C. DAVA Merges with an Endo Affiliate

In the fall of 2013, DAVA began considering various strategic options.[26] This process concluded on June 24, 2014, when DAVA's board of directors unanimously approved, and DAVA entered into, an Agreement and Plan of Merger between DAVA and an Endo affiliate (the "Merger Agreement"). Under the Merger Agreement, DAVA's stockholders were entitled to receive in the aggregate up to $600 million in consideration, comprised of $575 million in cash at the closing and contingent payments of up to $25 million.[27]

Dechert LLP ("Dechert"), DAVA's longtime legal advisor, represented DAVA in negotiating the Merger.[28] Dechert had represented DAVA in multiple previous transactions, including the Company's incorporation in Delaware.[29]

---

[24] Jenkins Aff. Ex. 1 at DAVA037532-33; Ex. 3 at DAVA003709-10.

[25] *Id.* Ex. 1 at DAVA037532-33.

[26] Jenkins Aff. Ex. 17.

[27] Am. Answer ¶ 7.

[28] Tepper Aff. ¶ 4; Moezinia Aff. ¶ 3.

[29] Tepper Aff. ¶ 4.

Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") was Endo's legal counsel in connection with the Merger.[30]

Consummation of the Merger required stockholder approval. Given that DAVA had a relatively small number of stockholders and Endo wanted to close the Merger as quickly as possible, Dechert recommended that the Company obtain stockholder approval via written consents (the "Written Consents").[31] DAVA proceeded with this course of action, and Dechert was responsible for preparing copies of the Written Consents for the stockholders to sign.[32]

At the time of the Merger, DAVA had a total of 600,826.58 shares of common stock outstanding.[33] Because approval of the Merger did not require unanimous stockholder consent, DAVA decided to seek Written Consents initially from its nine largest stockholders, which held in the aggregate over 95% of the total shares outstanding.[34] These nine stockholders each signed Written Consents purporting to approve the Merger and each executed the Merger Agreement, which is dated as of June 24, 2014.[35] Important to this action, as discussed further below, these Written

---

[30] Tepper Aff. ¶ 7; Moezinia Aff. ¶ 6.

[31] Schulman Aff. Ex. 26 (Goldberg Dep.) at 119.

[32] *Id.* Ex. 25 (Tepper Dep.) at 108-09; Ex. 26 (Goldberg Dep.) at 122; Ex. 27.

[33] Am. Answer ¶ 8.

[34] Tepper Aff. ¶¶ 7-8.

[35] *Id.*; Schulman Aff. Exs. 36-40; Jenkins Aff. Ex 25 at P-00216, P-00308-14.

Consents did not comply with certain requirements of Delaware law at that time because they were not properly dated.[36]

### D. DAVA's Efforts to Obtain a Written Consent from the Trust

After June 24, 2014, the date by which the Company believed it had obtained sufficient Written Consents for approval of the Merger, DAVA worked with Dechert to have the remaining stockholders execute Written Consents.[37] More specifically, Dechert prepared Written Consents for the remaining stockholders to sign and sent them to Tepper, who forwarded them to the stockholders along with copies of the Merger Agreement.[38] Ultimately, all of DAVA's stockholders other than the Trust—holding in the aggregate approximately 99.73% of DAVA's outstanding shares—signed Written Consents.[39]

On June 25, 2014, Dechert advised Tepper that, to the extent DAVA was unable to obtain Written Consents from any of the "small" stockholders, DAVA would be required under Sections 228 and 262 of the Delaware General Corporation

---

[36] Tr. 32 (Sept. 7, 2017) (Dkt. 170); *see also* Tepper Aff. ¶¶ 7-8 (explaining that some of the nine initial Written Consents were undated and that the others contained a typewritten date of June 24, 2014 that someone from Dechert apparently added after they were signed and returned to Tepper undated).

[37] Schulman Aff. Ex. 6 at DAVA00486.

[38] Tepper Aff. ¶¶ 10-12.

[39] Schulman Aff. Ex. 16.

Law to mail a notice promptly informing them of the execution of the Merger Agreement and their associated appraisal rights (the "Notice").[40]

On June 26, 2014, Tepper sent Cirillo a copy of the Merger Agreement and a Written Consent for the Trust to sign and return to him.[41] On July 1, 2014, having not heard back from Cirillo, Tepper followed up with him, to which Cirillo replied the next morning: "Hi sorry been tending to a family issue. I will go over everything tonite when back[.] [C]an u send me info on how my 1.5pc of dava got diluted to .27 of 1 pct[?] [T]hanks."[42] About two hours later, Tepper responded to Cirillo's request, providing "a chronology of the dilutive events that took place at the company."[43]

Also on July 2, Tepper exchanged emails with Michael Rosenberg, an associate at Dechert. In one email, Rosenberg expressed concern that sending the Notice to Cirillo could be "putting the gun in his hands" and suggested that Tepper call him directly to see if that could be avoided:

---

[40] *Id.* Ex. 6 at DAVA00486.

[41] *Id.* Ex. 29 at P-00017.

[42] *Id.* at P-00015-16.

[43] *Id.* at P-00015.

Lewis,

I was thinking, and will defer to your judgment on this, that maybe it makes sense to place a call to Cirillo directly. I don't know him as well as you, but I worry that if we send him a notice of appraisal rights etc, that it might be "putting the gun in his hands." Where a simple call asking him to get on Board [sic] with the Merger and sign the Consent, may have the desired outcome. I don't know how knowledgeable he is or how adverse to us he may be at this point but it's just a thought. At worst a call can do no worse than sending him the notice, which we'd have to do anyhow without the call.

What do you think?[44]

Dechert had been working internally to draft the Notice. On July 2 as well, Rosenberg sent an email to Richard Goldberg, the Dechert partner in charge of the deal, enclosing a draft of the Notice for Goldberg's review and comment. The email stated:

We are still in the hopes that we don't need these, but here are drafts of the Form of Notice and Appraisal Rights and the Letter of Transmittal for you to look over. Hopefully Lewis [Tepper] resolves everything with Cirillo and he signs the consent.[45]

On July 3, Goldberg provided his comments on the draft, raising the following points: "This says nothing about the merger agreement terms—price, escrow 20 m holdback. Closing conditions. Check other precedents. Do they?"[46] In response, Rosenberg said: "Of the six precedents I looked at only one goes through in any

---

[44] Jenkins Aff. Ex. 31 at DAVA000931.

[45] Schulman Aff. Ex. 21 at DAVA004399.

[46] *Id.* at DAVA004398.

detail the specific merger terms, the rest all just attach the Merger Agreement as an Annex, which I think works a bit cleaner."[47] To this, Goldberg simply replied "[s]o they don't mention the price."[48]

On July 3, 2014, having not received a Written Consent from the Trust, Tepper instructed Dechert to "get those notices ready to go."[49] The Notice that ultimately was sent to Cirillo stated that the holders of a majority of DAVA's stock had approved the Merger by Written Consent on June 24, 2014.[50] The Notice also informed the Trust of its right to seek appraisal of its shares within twenty days and included a Letter of Transmittal in the event it wanted to accept the Merger consideration.[51] Apparently mimicking Dechert's precedents, the Notice failed to include, among other things, any financial information relating to DAVA, any description of DAVA's business and its future prospects, and any information about how the Merger price was determined or whether the price was fair to stockholders.[52]

The three Director Defendants never discussed the contents of the Notice among themselves.[53] Moezinia and Walter entirely deferred to Tepper, as General

---

[47] *Id.*

[48] *Id.*

[49] Tepper Aff. ¶ 22; Schulman Aff. Ex. 13 at DAVA004367.

[50] Am. Answer ¶ 8; *see also* Jenkins Aff. Ex. 26 at P-00097.

[51] Jenkins Aff. Ex. 26 at P-00102-18.

[52] *See* Jenkins Aff. Ex. 26.

[53] Schulman Aff. Ex. 24 (Walter Dep.) at 87-88.

12

Counsel, and to Dechert, as DAVA's corporate counsel, with respect to the drafting and mailing of the Notice.[54] Tepper, in turn, took an almost entirely passive role with the preparation of the Notice. Other than reviewing (but not commenting on) the disclosures prepared by Dechert and asking a few administrative questions regarding mailing, timing, and whether certain disclosures needed to be sent along with the Notice, he played no role.[55] As Tepper put it, he and his "fellow directors relied entirely on Dechert with respect to the form and content of the Notice."[56]

On July 8, 2014, Tepper received an email from Cirillo indicating that he had received the Notice from Dechert and suggesting that he would provide a signed Written Consent for the Trust the following day.[57] On July 10, 2014, Cirillo emailed Tepper again, requesting that Tepper change the signatory to "Cirillo Family Trust," which Tepper did the same day.[58] The Trust ultimately did not sign the Written Consent or the Letter of Transmittal,[59] nor did it exercise its right to seek appraisal.

---

[54] *Id.* Ex. 23 (Moezinia Dep.) at 119; Ex. 24 (Walter Dep.) at 81.

[55] Tepper Aff. ¶¶ 20, 22.

[56] *Id.* ¶ 25.

[57] *Id.* ¶ 23; Schulman Aff. Ex. 30 at DAVA060966.

[58] Schulman Aff. Ex. 30 at DAVA060965.

[59] The Letter of Transmittal contained a provision that, with a few exceptions not relevant to this action, required its signatories to release DAVA, its officers, and its directors "from any and all liabilities of any kind or nature whatsoever arising at any time at or prior to the Closing." Jenkins Aff. Ex. 26 at P-00107.

The Merger closed on August 6, 2014.[60]  Over three years later, on September 20, 2017, after the Trust moved to amend its pleading to add a claim for failure to pay the Merger consideration, DAVA SR LLC (the Stockholders' Representative) paid the Trust the Merger consideration plus interest (totaling $1,336,282.41) for the 1,626 shares it purported to hold at the time of the Merger.[61]

## II.    PROCEDURAL HISTORY

The Trust filed this action on September 11, 2014, asserting one claim for breach of fiduciary duty against the Director Defendants for failing to include adequate financial information in the Notice.[62]  As a remedy, the Trust sought quasi-appraisal and damages to the extent that the court determined DAVA's fair value was greater than the Merger consideration.[63]

On February 23, 2015, after defendants had moved to dismiss the original complaint, the Trust filed the Amended Complaint, asserting two claims.[64]  Count I seeks rescissory damages against DAVA and the Director Defendants because of defects concerning the dating of the Written Consents.  Count II asserts that the

---

[60] Am. Answer ¶ 7.

[61] Dkt. 171.

[62] Compl. ¶¶ 18-20 (Dkt. 1).

[63] Compl. ¶ 20.

[64] The Amended Complaint was asserted on behalf of a putative class consisting of "every Dava stockholder except for the Director Defendants."  Am. Compl. ¶ 19.  On January 11, 2016, the court denied the Trust's motion for class certification for failure to satisfy the requirements of Court of Chancery Rule 23.  Tr. 8-9 (Jan. 11, 2016) (Dkt. 89).

Director Defendants breached their fiduciary duty because the Notice failed to include "any information that would enable [DAVA's] stockholders to determine whether to accept the Merger consideration or seek appraisal of their stock."[65]

The Director Defendants moved to dismiss Count II of the Amended Complaint, which the court denied on July 29, 2015.[66] The court explained that it was skeptical that the Trust would be able to prove that the Director Defendants had acted in bad faith with respect to the Notice since they likely relied on their advisors, but that the claim was reasonably conceivable at the pleading stage because of the complete lack of information that should have been disclosed in the Notice.[67]

On August 21, 2015, defendants filed an Answer and DAVA filed a Counterclaim, which were amended on January 19, 2016.[68] The Counterclaim asks the court to validate and declare effective certain Written Consents under 8 *Del. C.* § 205.[69]

---

[65] Am. Compl. ¶ 31.

[66] Tr. 51 (July 29, 2015) (Dkt. 46).

[67] *Id*. at 52-53 ("I am skeptical that the discovery will actually show [bad faith], because as you go forward and take some discovery, you may well find that [the directors] relied on advisors in good faith and just goofed and you can't get to the point of showing the level of scienter that's necessary. But at this pleading stage, which is the most favorable one to the plaintiff, it is at least reasonably conceivable that they could demonstrate that level of scienter because of the utter lack of information that should have been disclosed here.").

[68] Dkts. 47, 88.

[69] Dkt. 88.

On April 25, 2016, while fact discovery was still open, defendants filed a motion for summary judgment.[70] The court held this motion in abeyance pending the completion of fact discovery.[71] During the subsequent discovery, all three of the Director Defendants and Goldberg, the Dechert partner in charge of the transaction, were deposed.[72] On December 23, 2016, after fact discovery was substantially completed, defendants renewed their motion for summary judgment.[73] On January 13, 2017, the Trust filed another motion for leave to amend its complaint to assert four claims.[74]

On September 7, 2017, the court heard argument on defendants' motion for summary judgment and the Trust's motion to amend.[75] At the hearing, the court requested supplemental briefing on whether, in the absence of a viable claim for breach of fiduciary duty, a stockholder can pursue a "quasi-appraisal" claim against

---

[70] Dkt. 96.

[71] Dkt. 105.

[72] Schulman Aff. Exs. 23-26.

[73] Defs.' Mot. for Summ. J. Opening Br. (Dkt. 125).

[74] Mot. to File Second Amend. Compl. ("Mot. to Amend") (Dkt. 130).

[75] Tr. (Sept. 7, 2017) (Dkt. 170).

16

the surviving entity. That supplemental briefing prompted a further round of submissions,[76] which was completed on April 3, 2018.[77]

## III. ANALYSIS OF DEFENDANTS' SUMMARY JUDGMENT MOTION

I first address defendants' motion for summary judgment, which seeks dismissal with prejudice of Counts I and II of the Amended Complaint and the relief sought in DAVA's Counterclaim. For the reasons explained below, that motion will be granted in its entirety.

### A. Legal Standard

In order to prevail on a motion for summary judgment, the moving party must show that no material facts are in dispute and that it is entitled to judgment as a matter of law.[78] Once the moving party has satisfied its initial burden of demonstrating the absence of a material factual dispute, "the burden shifts to the nonmovant to present some specific, admissible evidence that there is a genuine issue of fact for a trial."[79] Although "the facts of record, including any reasonable

---

[76] The additional submissions addressed the Trust's argument that 8 *Del. C.* § 262(d)(2) imposes a statutory obligation on a "constituent corporation" to disclose sufficient information to permit stockholders to make a fully-informed decision whether to exercise appraisal rights, and that a breach of that obligation entitles a stockholder to a quasi-appraisal remedy against the surviving corporation. Dkt. 172 at 3-4.

[77] Dkts. 184, 186.

[78] Ct. Ch. R. 56(c).

[79] *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 356 (Del. Ch. 2008) (citation omitted).

17

inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party,"[80] the nonmoving party must affirmatively present evidence— "not guesses, innuendo or unreasonable inferences"—demonstrating the existence of a genuine issue of fact.[81] Mere conclusory allegations are insufficient to defeat a motion for summary judgment.[82]

> **B. Defendants are Entitled to Summary Judgment on Count I of the Amended Complaint and the Counterclaim Because Technical Defects Involving the Dating of Certain Written Consents will be Judicially Validated Under 8 *Del. C*. § 205**

In Count I of the Amended Complaint, the Trust seeks rescissory damages against DAVA and the Director Defendants based on the failure of a majority of the Written Consents to "comply with the date requirement of 8 *Del. C.* § 228(c)."[83] At the time of the Merger, Section 228(c) provided, in relevant part, that "[e]very written consent shall bear the date of signature of each stockholder or member who

---

[80] *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 191 (Del. 2009) (citation omitted).

[81] *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *6 (Del. Ch. May 22, 2000) (citation omitted).

[82] *Brandywine Dev. Grp., L.L.C. v. Alpha Trust*, 2003 WL 241727, at *5 (Del. Ch. Jan. 30, 2003).

[83] Am. Compl. ¶ 27. Count I originally sought rescission of the Merger, but the Trust withdrew this request for relief. Tr. 34 (July 29, 2015).

signs the consent."[84]  The statute was amended in 2017 to eliminate this requirement.[85]

Defendants admit "that most of the Written Consents were not dated by signatories on the dates they were signed" and that "[t]hey were either undated or the dates were inserted later by Dechert."[86]  They argue that non-compliance with the dating requirement in the previous version of Section 228(c) was a mere technical deficiency, emphasizing that it is undisputed that the vast majority of DAVA's stockholders wanted to approve the Merger.  In its Counterclaim, DAVA specifically asks the court to validate under 8 *Del. C.* § 205 the Written Consents of the Company's seven largest stockholders at the time of the Merger, who collectively held 556,822.41 shares of DAVA common stock, or approximately 92.7% of the outstanding shares.[87]

As this court has previously explained, the requirements of Section 228 are not to be taken lightly because the statute bestows stockholders with the power to take swift and wide-ranging action.[88]  "But with great power comes great

---

[84] 8 *Del. C.* § 228(c) (West 2014) (amended 2017).

[85] S. B. 69, 149th Gen. Assemb., Reg. Sess. (Del. 2017).

[86] Defs.' Mot. for Summ. J. Reply Br. 28 (Dkt. 141); *see also* Tr. 34, 73-74 (Sept. 7, 2017).

[87] Countercl. ¶¶ 1, 4-9, 15 (Dkt. 88).

[88] *See Espinoza v. Zuckerberg*, 124 A.3d 47, 56 (Del. Ch. 2015) (quoting 8 *Del C.* § 228(a)) ("[A]ny action that may be taken at any annual or special meeting of stockholders may be

19

responsibility."[89] "Because Section 228 permits immediate action without prior notice to minority stockholders, the statute involves great potential for mischief and its requirements must be strictly complied with if any semblance of corporate order is to be maintained."[90] Thus, the Delaware Supreme Court has held that the statute must be "given its plain meaning," which requires adherence to the condition that "any corporate action taken under [Section] 228 is effective only upon the delivery of the proper number of valid and unrevoked consents to the corporation."[91] This mandatory adherence has been extended even to the ministerial requirements of Section 228, such as the dating of consents by each consenting stockholder when the statute contained such a requirement.[92]

Since it became effective on April 1, 2014, however, Section 205 of the Delaware General Corporation Law has provided a mechanism for corporations to seek relief from this court to validate defective corporate acts that would otherwise

---

taken by majority stockholder consent (or whatever other voting threshold applies for a particular act) 'without a meeting, without prior notice and without a vote.'").

[89] *Withrow v. Williams*, 507 U.S. 680, 716 (1993).

[90] *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 641 (Del. Ch. 2013) (citation and internal quotations omitted).

[91] *Allen v. Prime Comput., Inc.*, 540 A.2d 417, 420 (Del. 1988).

[92] *See H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 152 (Del. Ch. 2003) (refusing to dismiss a claim that consents were invalid because they were not individually dated and holding that "the date requirement set forth by Section 228(c) must be strictly enforced").

be considered incurable.[93]  Specifically, Section 205 authorizes the court to "[d]etermine the validity of any corporate act or transaction," "[v]alidate and declare effective any defective corporate act," and to "[d]eclare that a defective corporate act validated by the court shall be effective as of the time of the defective corporate act."[94]  As this court has explained, the underlying purpose of the statute "fundamentally concerns a company having taken an act with the intent and belief that it is valid and later petitioning the Court to correct a technical defect and thereby remedy incidental harm."[95]  Here, no one has questioned the authenticity of the signatures on the Written Consents or the intent and desire of all stockholders other than the Trust—holding 99.7% of DAVA's stock—to approve the Merger.

Section 205(d) sets forth a number of factors the court may consider in reaching its determination whether to validate the defective corporate act in question:

> (1) Whether the defective corporate act was originally approved or effectuated with the belief that the approval or effectuation was in compliance with the provisions of this title, the certificate of incorporation or bylaws of the corporation;

---

[93] *See In re Numoda Corp. S'holders Litig.*, 2015 WL 402265, at *7 (Del. Ch. Jan. 30, 2015) (citation omitted) ("The legislation thus empowers the Court to grant an equitable remedy for corporate acts that once would have been void at law and unreachable by equity.").

[94] 8 *Del. C.* § 205.

[95] *In re Genelux Corp.*, 126 A.3d 644, 669 (Del. Ch. 2015).

(2) Whether the corporation and board of directors has treated the defective corporate act as a valid act or transaction and whether any person has acted in reliance on the public record that such defective corporate act was valid;

(3) Whether any person will be or was harmed by the ratification or validation of the defective corporate act, excluding any harm that would have resulted if the defective corporate act had been valid when approved or effectuated;

(4) Whether any person will be harmed by the failure to ratify or validate the defective corporate act; and

(5) Any other factors or considerations the Court deems just and equitable.[96]

In my view, all five of the Section 205(d) factors weigh in favor of judicial validation.

First, the record demonstrates that DAVA's board effectuated the Merger with the belief, relying on Dechert's advice, that the holders of more than 95% of DAVA's common stock—a clearly sufficient amount to approve the Merger—had validly executed and delivered the Written Consents.[97]

Second, the evidence shows that DAVA's board and holders of 99.7% of DAVA's stock have always treated the Written Consents as if they were valid and

---

[96] 8 *Del. C.* § 205(d).

[97] Moezinia Aff. ¶¶ 5-11; Tepper Aff. ¶¶ 6-18.

effective.[98]  The Trust itself did not question the validity of the Merger until it amended its complaint over six months after the transaction closed.

Third, no one will, or could, be harmed by the validation of the Written Consents given the evidence that all stockholders, other than the Trust, intended to vote in favor of the Merger.[99]  The Trust argues that it would be harmed by validation because if Count II does not survive, "then the relief under Count I may be plaintiff's only alternative to obtain redress for the wrongs it has suffered."[100]  This argument ignores the portion of Section 205(d)(3) that excludes from the factors that the statute identifies for consideration "any harm that would have resulted if the defective corporate act had been valid when approved or effectuated."[101]  Had the Written Consents been valid, the Trust never would have been able to use an attack on their validity to seek damages in connection with the Merger.  The short answer to the Trust's argument is that Count II should rise and fall on its own merits.

Fourth, DAVA and all of its former stockholders who signed the Merger Agreement stand to be harmed if DAVA is forced to continue litigating the validity

---

[98] Moezinia Aff. ¶ 9; Tepper Aff. ¶ 16.

[99] Moezinia Aff. ¶¶ 10-11; Tepper Aff. ¶¶ 17-18.

[100] Pl.'s Mot. for Summ. J. Answering Br. 58 (Dkt. 137).  The Trust also contends that the record is incomplete because defendants have submitted "only" two affidavits attesting to the facts.  This argument is without merit.  There is no dispute as to the underlying material facts in this action.  Additional affidavits would be duplicative and are unnecessary.

[101] 8 *Del. C.* § 205(d)(3).

of the Written Consents.[102]  The Merger closed nearly three years ago, and DAVA has been operating as a subsidiary of Endo ever since.  Thus, "the metaphorical merger eggs have been scrambled."[103]

Fifth, validating the Written Consents is consistent with the underlying purpose of the statute.  The failure to properly date the Written Consents is the epitome of a technical shortcoming that the Delaware General Assembly sought to address when it promulgated Section 205.[104]  Indeed, as noted above, Section 228(c) was amended in 2017 to eliminate the requirement that written consents bear the date of signature of the consenting stockholder, which suggests that this requirement was technical in nature and a superfluous condition to the use of written consents.

\* \* \* \* \*

For the reasons stated above, defendants' motion for summary judgment (i) affording DAVA the relief sought in its Counterclaim under 8 *Del. C.* § 205 and (ii) dismissing Count I of the Amended Complaint with prejudice will be granted.

---

[102] Moezinia Aff. ¶ 11; Tepper Aff. ¶ 18.

[103] *Transkaryotic Therapies*, 954 A.2d at 362 (citation omitted).

[104] *See Numoda*, 2015 WL 402265, at *8 (citations omitted) ("[T]he General Assembly drafted the law in hopes of creating an adaptable, practical framework for corporations and their counsel.  An important goal was to facilitate correction of mistakes made in the context of a corporate act without disproportionately disruptive consequences.  Part of this effort was to eliminate hyper-technical distinctions and the uncertain divide between void and voidable acts.").

**C.** **Defendants are Entitled to Summary Judgment on Count II Because the Trust Cannot Establish a Non-Exculpated Claim for Breach of Fiduciary Duty**

In Count II of the Amended Complaint, the Trust asserts that the Director Defendants breached their fiduciary duty in two respects: (i) by incorrectly informing DAVA's stockholders that the Merger had been approved by the Written Consents of the holders of a majority of the Company's stock; and (ii) by failing to include "any information that would enable those stockholders to determine whether to accept the Merger consideration or seek appraisal of their stock."[105]

The first aspect of this claim is moot given the disposition of the Counterclaim, as discussed above, validating the Merger as approved by holders of a majority of the Company's stock.

With respect to the second aspect of Count II, the Delaware Supreme Court has articulated the overarching standard for directors' communications with stockholders as follows:

> Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty. It follows *a fortiori* that when directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty.[106]

---

[105] Am. Compl. ¶ 31; *see also* Pl.'s Mot. for Summ. J. Answering Br. 24-25.

[106] *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998) (citation omitted); *cf. Gilliland v. Motorola, Inc.*, 859 A.2d 80, 88 (Del. Ch. 2004) ("[A] notice given pursuant to section 262 [informing stockholders of their appraisal rights] must contain, at a minimum, summary

A disclosure-based claim for breach of fiduciary duty thus may implicate both the duty of care and the duty of loyalty.[107]

At the times relevant to this action, DAVA's certificate of incorporation contained a provision, authorized under 8 *Del. C.* § 102(b)(7), exculpating DAVA's directors from monetary liability resulting from a breach of fiduciary duty to the fullest extent permissible under Delaware law.[108] Thus, the Director Defendants are exculpated for any breach of their duty of care, and the Trust's breach of fiduciary duty claim can survive only if a genuine issue of fact exists in support of a claim that the Director Defendants breached their duty of loyalty.[109] In that vein, the Trust advances two arguments in support of a loyalty claim against the Director Defendants concerning the Merger: that they (i) were self-interested and lacked independence, and (ii) acted in bad faith. I address the arguments in that order.

---

financial and trading data and reference to the publicly available sources from which more complete information is available.").

[107] *See Zirn v. VLI Corp.*, 621 A.2d 773, 778 (Del. 1993) (citation omitted) ("The requirement that a director disclose to shareholders all material facts bearing upon a merger vote arises under the duties of care and loyalty.").

[108] *See* Schulman Aff. Ex. 15 ¶ 10 ("The directors of the Corporation shall be entitled to the benefits of all limitations on the liability of directors generally that are now or hereafter become available under the DGCL.").

[109] *See In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 65 (Del. 2006) (citing 8 *Del. C.* § 102(b)(7)) ("Thus, a corporation can exculpate its directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith.").

26

### 1. The Director Defendants Were Not Self-Interested and Did Not Lack Independence with Respect to the Merger

The Trust contends that the Director Defendants either were self-interested or lacked independence with respect to the Warrants issued in January 2013 and that it was a breach of their duty of loyalty not to provide information about these conflicts in the Notice.[110]

"Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit not received by the shareholders generally."[111] "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[112] To establish that directors lack independence, a plaintiff must show "that the directors are 'beholden' to the [interested party] or so under [its] influence that their discretion would be sterilized."[113]

Assuming for the sake of argument that some or all of the Director Defendants were self-interested and/or lacked independence with respect to the issuance of the Warrants, an issue on which I express no opinion, the Trust's argument fails because

---

[110] Pl.'s Mot. for Summ. J. Answering Br. 37-39.

[111] *Cede & Co. v. Technicolor, Inc.* 634 A.2d 345, 362 (Del. 1993) (citation omitted).

[112] *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993) (alternations omitted) (quoting *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984)).

[113] *Id.* (citation omitted).

27

it focuses on a transaction unrelated to the Merger. The Warrants in question were issued in January 2013 as part of the Debt Purchase. The Merger was the culmination of a review of strategic options that began in the fall of 2013 and ended when the Merger closed in August 2014. Plaintiff concedes that the issuance of the Warrants and the Merger were not part of a unitary transaction, and nothing in the record suggests otherwise.[114] Thus, whether any of the DAVA directors who *approved the Warrants* were self-interested or lacked independence with respect to that transaction may be relevant to an "improper dilution" claim,[115] but that issue has no bearing on the separate matter of whether the Director Defendants *who approved the Merger* approximately nineteen months later were self-interested or lacked independence with respect to the Merger.

Putting the Warrants aside, the undisputed facts of record are that the Merger was an arm's-length transaction between unaffiliated parties, each represented by separate counsel: Dechert for DAVA and Skadden for Endo.[116] The Merger was

---

[114] *See* Tr. 55-56 (Sept. 7, 2017) ("Q: And there's no indication I have seen in the record—you can tell me differently—that this [Warrant issuance] was some preliminary step to a unitary transaction [*i.e.*, the Merger]. A: Right. It clearly was not."); *cf. Noddings Inv. Grp., Inc. v. Capstar Commun'cs. Inc.*, 1999 WL 182568, at *6 (Del. Ch. Mar. 24, 1999) (citation omitted) ("The [step transaction] doctrine treats the 'steps' in a series of formally separate but related transactions involving the transfer of property as a single transaction, if all the steps are substantially linked. Rather than viewing each step as an isolated incident, the steps are viewed together as components of an overall plan.").

[115] *See infra* IV.C.

[116] Tepper Aff. ¶¶ 3, 7; Moezinia Aff. ¶¶ 3, 6.

not a self-interested transaction implicating the duty of loyalty. The Director Defendants did not stand on both sides of the transaction, nor did they derive any personal benefit different from that bestowed on other stockholders. To the contrary, they had the same financial incentive to maximize the consideration received in the Merger because their shares of DAVA were cashed out at the same price that the Trust and every other stockholder of the Company received. The Trust also has presented no facts suggesting that the Director Defendants were beholden to Endo or otherwise lacked independence with respect to the Merger.

In sum, no genuine issue of fact exists calling into question the Director Defendants' alignment of interests and independence with respect to the Merger. Thus, given the Section 102(b)(7) exculpatory provision in DAVA's certificate of incorporation, the only potential way for Count II to survive defendants' motion for summary judgment is for there to be a genuine issue of fact that the Director Defendants acted in bad faith in connection with the preparation of the Notice. I address this argument next.

### 2. The Director Defendants' Actions with Respect to the Contents of the Notice Do Not Amount to Bad Faith

The Trust contends that, "[e]ven if the directors were neither interested in nor lacked independence in connection with the Notice, their actions were in bad faith, and thus they cannot be exculpated for their breaches under a Section 102(b)(7)

provision."[117]   More specifically, the Trust argues that the Director Defendants engaged in bad faith conduct by intentionally failing to disclose, or recklessly not disclosing, material information about the Company in the Notice.[118]

"A showing of bad faith requires an 'extreme set of facts to establish that disinterested directors were intentionally disregarding their duties or that the decision . . . [was] so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any other ground other than bad faith.'"[119]   The undisputed factual record shows that this is not one of those "extreme" cases.

As the court expressed at an earlier hearing, the Notice was totally bereft of information required under Delaware law to permit a stockholder to decide whether to seek appraisal in lieu of accepting the Merger consideration.[120]   The relevant inquiry here, though, is not whether the Notice was legally deficient (it clearly

---

[117] Pl.'s Mot. for Summ. J. Answering Br. 39.

[118] *Id.* at 39-40 (citing *Johnson v. Shapiro*, 2002 WL 31438477, at *8 (Del. Ch. Oct. 18, 2002)).

[119] *Nguyen v. Barrett*, 2016 WL 5404095, at *3 (Del. Ch. Sept. 28, 2016) (citing *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *7 (Del. Ch. May 20, 2016)).

[120] *See* Tr. 52 (July 29, 2015) ("I read the notice that was provided to the stockholder in this case, and there is, if not zero, as close to zero as you could get by way of information that would be relevant to allow somebody to make a determination as to whether or not to seek appraisal.  For example, you will not find in the notice a financial analysis supporting the basis for the merger price.  You won't find any projections.  You won't find any discussion of the prospects of the business.  You won't find any elaboration upon the process by which the board reached the conclusion that it did that this was an appropriate price in recommending that the merger occur.").

was),[121] but whether the Director Defendants acted in bad faith with respect to the preparation of the Notice and the disclosures it contained. Because the unrebutted record shows that the Director Defendants reasonably relied upon DAVA's longtime outside corporate counsel to prepare the Notice, their actions do not rise to the threshold required for bad faith as a matter of law.

Justifiable reliance on outside counsel evinces good faith, not an improper dereliction of duty.[122] Indeed, reliance by corporate directors on outside experts for specialized, technical, or esoteric matters should be encouraged and not

---

[121] *See Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000) ("[A] stockholder deciding whether to seek appraisal should be given financial information about the company that will be material to that decision."); *Gilliland*, 859 A.2d at 88-89 ("[M]inimal disclosure . . .—a brief summary of the financial numbers and a description of where the more exhaustive disclosures would be located—would have sufficed. [Defendant], however, did not even provide this minimal disclosure and, therefore, did not satisfy its disclosure duty."); *Berger v. Pubco Corp.*, 2008 WL 2224107, at *3 (Del. Ch. May 30, 2008) ("Clearly, some financial data about the company is materially relevant to the decision of whether or not to seek appraisal, but such disclosure is ultimately asymptotic; it eventually becomes an exercise in diminishing returns."), *rev'd on other grounds*, 976 A.2d 132 (Del. 2009); *Nagy v. Bistricer*, 770 A.2d 43, 51 (Del. Ch. 2000) (finding that the directors breached their duty of disclosure where a post-transaction information statement contained no information regarding (i) the value of the constituent corporations, (ii) the reasons why the board supported the transaction, (iii) the directors' decision-making process in supporting the transaction, or (iv) the directors' interest in the acquirer); *Turner v. Bernstein*, 776 A.2d 530, 535 (Del. Ch. 2000) (finding that the directors breached their duty of disclosure where the stockholders "did not even receive the company's most recent financial results for the periods proximate to the vote," "any projections of future company performance," or "any explanation of why the [] board believed that the merger consideration was more worthwhile to the stockholders than the returns that could be expected if the company were to pursue its existing business plan").

[122] *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1142 (Del. Ch. 1994) (Allen, C.) ("I find the Technicolor board's reliance upon experienced counsel to evidence good faith and the overall fairness of the process.").

condemned.[123] In that vein, Delaware law *statutorily* encourages directors to rely on experts, including legal counsel, to inform themselves and properly discharge their fiduciary duties.[124]

Moezinia is not a lawyer.[125] Although Tepper and Walter both were trained as lawyers, neither has expertise in Delaware mergers and acquisitions law.[126] Dechert had served as DAVA's primary outside counsel for corporate transactional matters since DAVA was founded as a Delaware corporation in 2004.[127] Based on their prior dealings with Dechert and its professional reputation, it was reasonable for the Director Defendants to believe that the law firm was competent to provide

---

[123] *See* Leo E. Strine, Jr., *Documenting the Deal: How Quality Control and Candor Can Improve Boardroom Decision-Making and Reduce the Litigation Target Zone*, 70 BUS. LAW. 679, 680 (2015) (noting that "fundamental principles of corporate law . . . entitle [impartial] fiduciaries to rely upon the advice of impartial experts as a defense."); *id*. at 683 (citing 8 *Del. C.* § 141(e)) ("In the ordinary course of business, the non-management directors rely principally upon management for advice, information, and specialized expertise. Under the DGCL, they are entitled to rely upon this input as a defense if they face a lawsuit. When the directors' normal source of advice has become conflicted, the directors must scramble to seek substitute independent advice.")

[124] *See infra* III.C.3 (discussing Section 141(e)).

[125] Moezinia Aff. ¶ 3.

[126] *See* Tepper Aff. ¶ 6 ("Although I am a lawyer, I am not an expert on Delaware law, including without limitation Delaware corporate law relating to mergers, appraisal rights, and/or any related disclosures to stockholders that may be required by statute or case law."); Schulman Aff. Ex. 24 (Walter Dep.) at 84 ("Q: Focusing on your knowledge at the time—and this will be 2014—did you know what needed to be sent to stockholders in connection with the merger under Delaware law? A: No.").

[127] Tepper Aff. ¶ 4.

legal advice in connection with the Merger.[128]  More specifically, it was reasonable

for them to rely on Dechert—as they testified they did—to ensure compliance with

the legal requirements for obtaining stockholder approval by written consent,

including the provision of a notice of appraisal rights to any non-consenting

stockholder, in accordance with the recommendation Dechert made to pursue this

course for obtaining stockholder approval of the Merger.[129]

---

[128] *See id.* ("Dechert represented DAVA in connection with its formation as a Delaware corporation in 2004 and in numerous other transactional matters during the 10 years of DAVA's existence prior to the Merger.  On each occasion, I had determined that Dechert provided DAVA with competent and sound legal representation.  I also knew, based on DAVA's prior experience with Dechert, that Dechert was a prominent international law firm, consistently highly rated by leading legal directories, with specific expertise in mergers and acquisitions."); Moezinia Aff. ¶ 3 ("Dechert had been DAVA's corporate counsel since the Company's inception in 2004.  It held itself out as a prominent international law firm.  I was informed that Dechert was consistently highly rated, with specific expertise in mergers and acquisitions.").

[129] *See* Tepper Aff. ¶ 6 ("I worked with Dechert in obtaining the signatures on the Written Consents, but I relied entirely on Dechert to draft the Written Consents and assure that they complied with Delaware law"); *id.* ¶ 22 ("Other than the few questions I asked regarding mailing, timing and whether the Disclosure Schedules needed to be sent along with the Notice, neither I, nor to the best of my knowledge any of the other Board members, raised any questions, offered any comments or sought any changes in the Notice and accompanying materials prepared by Dechert."); Moezinia Aff. ¶ 5 ("I and my fellow Board members relied in good faith on Dechert to prepare the Written Consents in conformity with applicable law and ensure the propriety of the manner in which the signatories executed and dated the Written Consents."); *id.* ¶ 12 ("As was the case with the Written Consents, in connection with the Disclosures that accompanied the notice of appraisal rights that was sent to Plaintiff,[] the Board relied entirely, and in good faith, on Dechert for advice regarding the form and content of the notice and compliance with the disclosure requirements under Delaware law."); Schulman Aff. Ex. 24 (Walter Dep.) at 81 ("Q:  Do you recall any discussions with Mr. Griffin concerning the documents required to be signed by DAVA's stockholders in connection with the merger with Endo?  A:  No.  We let the lawyers and Dec[h]ert figure out all the appropriate documentation."); *id.* at 83 ("Q: We'll represent to you that this is the stockholder notice received by Mr. Cirillo in

The Trust criticizes Walter and Moezinia for relying on Tepper to handle the Notice properly, and it takes issue with Tepper deferring almost entirely to Dechert with respect to the dissemination and content of the Notice. To the limited extent that Tepper was involved, the Trust faults him because "Tepper and Dechert discussed that they did not want to send the Cirillo Trust a notice of appraisal rights because, by doing so, they would be 'putting the gun in his hands.'"[130]

To my mind, it is logical that Walter and Moezinia would look to Tepper as the Company's General Counsel to oversee the legalities of providing notice of a transaction to stockholders. It also makes eminent sense that Tepper would assign responsibility for ensuring that the Notice complied with the requirements of Delaware law to the counsel specifically retained to advise the Company on the Merger.

As for the "gun in his hands" email, Rosenberg, *not* Tepper, made this comment. The plain language of Rosenberg's message, although inflammatory, indicates that the email was intended as a suggestion that a phone call could facilitate the Trust's approval of the Merger and avoid the need to send the Notice. Nothing in that email suggests that Dechert did not know how to prepare a legally compliant

---

connection with the merger between Endo and DAVA. Did you play any role in drafting, editing, reviewing this document? A: You mean other than hiring the lawyers to do it—no.").

[130] Pl.'s Mot. for Summ. J. Answering Br. 43.

notice, that Tepper should have questioned Dechert's competence on that matter, or that DAVA would not provide the Trust with the Notice when required to do so. Indeed, the record bears this out—within twenty-four hours of receiving Rosenberg's email, Tepper instructed him to get the Notice "ready to go."[131]

The Trust also contends that the Director Defendants acted in bad faith in a number of contexts apart from the Notice. For example, the Trust argues that (i) Walter acted in bad faith because he allowed his fellow Guggenheim executive Griffin to "act as his proxy" at board meetings, and he failed to read a pleading filed on his behalf in this action, (ii) Moezinia acted in bad faith because he ducked questions at his deposition and repeated a "rehearsed response," and (iii) Tepper acted in bad faith because he tried to get the Trust to sign the Written Consent, which would cause it to waive its appraisal rights.[132] These arguments miss the mark. The issue here is whether the Director Defendants acted in bad faith with respect to the failure to include material information in the Notice. These allegations have nothing to do with the content of the Notice and thus are legally irrelevant to the basis for asserting a breach of fiduciary duty claim under Count II.[133]

---

[131] *See* Jenkins Aff. Ex. 31 at DAVA000931 (Rosenberg's "guns in his hands" email to Tepper at 3:08 p.m. on July 2, 2014); Schulman Aff. Ex. 13 at DAVA004367 (Tepper's "ready to go" email to Rosenberg at 12:15 p.m. on July 3, 2014).

[132] Pl.'s Mot. for Summ. J. Answering Br. 40-44.

[133] The Trust does not allege, nor does it provide any evidence to support, that the Board discussed the Notice at the meetings that Walter did not attend.

35

In sum, the record reflects that the Director Defendants reasonably relied on DAVA's corporate counsel to prepare the Notice in accordance with the requirements of Delaware law. Nothing in the record suggests that the Director Defendants knew or should have known that Dechert was not competent to prepare the Notice or that its legal advice concerning the contents of the Notice would end up being so erroneous.[134] As such, it cannot be said as a matter of law that the Director Defendants intentionally disregarded their duties with respect to the Notice's failure to disclose material information, or that their reliance on Dechert to prepare the Notice was inexplicable on any other ground other than bad faith. Accordingly, the Director Defendants are entitled to entry of judgment dismissing Count II with prejudice.

### 3. Section 141(e) Shields the Director Defendants

Invoking Section 141(e) of the Delaware General Corporation Law, the Director Defendants argue that Count II should be dismissed for the "independent reason" that they relied in good faith on counsel in connection with "the drafting and dissemination of the Notice."[135] Although the relevant analysis under Section 141(e) is nearly identical to the fiduciary duty one above, *i.e.*, whether the Defendant

---

[134] Even the Trust conceded that "you would have assumed Dechert should have sufficient experience to" prepare the Notice. Tr. 63 (Sept. 7, 2017).

[135] Defs.' Mot. for Summ. J. Opening Br. 41.

Directors acted in good faith by relying on Dechert to prepare the Notice, Section 141(e) provides a distinct *statutory* ground for dismissal of Count II.[136]

Section 141(e) states, in relevant part, that:

> A member of the board of directors . . . shall, in the performance of such member's duties, be fully protected in relying in good faith upon . . . such information, opinions, reports or statements presented to the corporation by any . . . person as to matters the member reasonably believes are within such . . . person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.[137]

Legal advisors qualify as experts under Section 141(e),[138] and the statute provides a complete safe harbor against "personal liability of a director for losses arising from 'illegal' transactions if a director were financially disinterested, acted in good faith, and relied on advice of counsel reasonably selected in authorizing a transaction."[139] For the reasons explained above, each of these elements is satisfied here: the Director Defendants' interests in the Merger were aligned with DAVA's

---

[136] *See Cinerama*, 663 A.2d at 1142 (citing 8 *Del. C.* § 141(e)) ("Indeed, it is arguable that the board's good faith reliance on this legal testimony may provide an independent basis for finding the directors not liable for approving the sale.").

[137] 8 *Del. C.* § 141(e).

[138] *Cinerama*, 663 A.2d at 1142.

[139] *Gagliardi v. TriFoods, Int'l, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996) (Allen, C.) (citing 8 *Del. C.* § 141(e)). *See In re Rural Metro Corp.*, 88 A.3d 54, 87 (Del. Ch. 2014) (citing 8 *Del. C.* § 141(e) and emphasis added) ("There are sound reasons why the General Assembly could have decided rationally to authorize exculpation for independent, disinterested directors who act in good faith, but not to extend exculpation to the highly compensated advisors on whom the *directors are entitled (and encouraged) to rely*."), *appeal dismissed*, 105 A.3d 990 (Del. 2014) (TABLE).

other stockholders, there was no question as to their independence, and they acted in good faith with respect to the preparation of the Notice by reasonably relying on DAVA's long-time corporate counsel to prepare the Notice.[140]

The Trust makes three arguments as to why Section 141(e) should not shield the Director Defendants in this case, none of which is availing. First, the Trust argues that reliance on counsel is an affirmative defense on which the Director Defendants have the burden of proof, which has not been met. The parties dispute who has the burden of proof on this issue, but even assuming the Director Defendants bear the burden, it has been met. It is unrebutted, for the reasons already discussed, that each of the Director Defendants' reliance on Dechert reached a level of essentially complete dependence with respect to the legal aspects of the Merger, including the contents of the Notice. The undisputed facts also show that the Director Defendants selected Dechert, DAVA's long-standing corporate counsel, with reasonable care to guide the Company through the Merger, and that the Director Defendants relied in good faith on Dechert's advice with respect to subject matters they believed fell within Dechert's professional judgment.[141]

Second, the Trust argues that the Director Defendants breached their duty of loyalty, so advice of counsel is not a complete defense but only one factor to be

---

[140] *See supra* III.C.1-2.

[141] Schulman Aff. Ex. 25 (Tepper Dep.) at 102-03; Tepper Aff. ¶ 4.

considered by the court.[142] As previously explained, however, given the factual record before the court, the Director Defendants did not breach their duty of loyalty as a matter of law, so their good-faith reliance on Dechert insulates them from monetary liability.

Third, the Trust contends that the Director Defendants did not properly rely on counsel in this case because "there was no actual 'advice' from Dechert to anyone at Dava in connection with the contents of the Notice."[143] This argument is puzzling, to say the least, and unsupported by the factual record. Unrebutted evidence demonstrates that the Director Defendants relied on Dechert to prepare the Notice, and the Trust has cited no authority that supports the bizarre proposition that relying on outside counsel to prepare the required documentation for a merger does not constitute relying on legal advice.

\* \* \* \* \*

For all of the reasons stated above, defendants' motion for summary judgment is granted in its entirety. I now turn to the Trust's motion to amend.

---

[142] Pl.'s Mot. for Summ. J. Answering Br. 48-49 (citing *Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 751 (Del. Ch. 2007)).

[143] Pl.'s Mot. for Summ. J. Answering Br. 50.

## IV.    ANALYSIS OF THE TRUST'S MOTION TO AMEND

In its motion to amend, the Trust seeks to expand the scope of one of its claims in the Amended Complaint (Count II) and to add two new claims.[144]  For reasons I will explain, the motion to amend is granted in part and denied in part.  Specifically, the Trust's request to amend as to proposed Counts I, II, and IV is denied, and its request to amend as to proposed Count III is granted in a limited respect.

### A.    Legal Standard

Under Court of Chancery Rule 15(a), leave to amend a complaint "shall be freely given when justice so requires."  It is appropriate for courts to deny leave to amend where "there is evidence of bad faith, undue delay, dilatory motive, undue prejudice or futility of amendment."[145]  "An amendment is futile if it would not survive a motion to dismiss under Court of Chancery Rule 12(b)(6)."[146]

The standards governing a motion to dismiss for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate

---

[144] *See* Mot. to Amend Ex. A (Dkt. 130).

[145] *U.S. Bank Nat. Ass'n v. U.S. Timberlands Klamath Falls, L.L.C.*, 2005 WL 2093694, at *1 (Del. Ch. Mar. 30, 2005) (citation omitted).

[146] *Cartanza v. LeBeau*, 2006 WL 903541, at *2 (Del. Ch. Apr. 3, 2006).

unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[147]

The standards are minimal, but the court "will not credit conclusory allegations or draw unreasonable inferences in favor of the Plaintiffs."[148]

## B.    The Motion to Amend as to Proposed Count I is Denied as Futile

Count I of the proposed Second Amended Complaint is substantively identical to Count I of the Amended Complaint.[149]  They both seek rescissory damages based on defects in the dating of certain Written Consents.  Because the court has granted summary judgment in favor of defendants on this claim,[150] amendment would be futile.

## C.    The Motion to Amend as to Proposed Count II is Denied as Futile

Count II of the proposed Second Amended Complaint seeks to expand the scope of the fiduciary duty claim asserted against the Director Defendants in Count II of the Amended Complaint in two respects.  First, it seeks to add a claim for improper dilution arising out of (i) the issuance of the Warrants at below fair market value in early 2013 in a transaction where a majority of the directors allegedly were

---

[147] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citations omitted).

[148] *In re BJ's Wholesale Club, Inc. S'holders Litig.*, 2013 WL 396202, at *5 (Del. Ch. Jan. 31, 2013) (citation omitted).

[149] The only substantive difference between the two claims is that Count I of the proposed Second Amended Complaint formally drops the Trust's request for rescission.

[150] *See supra* II.B.

41

interested or lacked independence, and (ii) the grant of the Stock Options to DAVA employees later in 2013 at prices below fair market value (the "Dilution Claim").[151] Second, it seeks to expand its claims relating to the Merger in order to allege that the Notice improperly failed to disclose information relating to the issuance of the Warrants and the Stock Options.

The Director Defendants argue that it would be futile to grant leave to add the Dilution Claim because, among other reasons, it is a derivative claim that was extinguished by the Merger. I agree.

In *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, our Supreme Court held that determining whether a given claim is direct or derivative should be based solely on the answer to two questions: "(1) who suffered the alleged harm . . . and (2) who would receive the benefit of any recovery or other remedy"?[152] Dilution claims are typically viewed as derivative under Delaware law.[153] That is because the alleged

---

[151] Mot. to Amend. Ex. A ¶ 65. In connection with these new allegations, the Trust also seeks to add three former directors of DAVA who were on its board when these transactions were approved: John Klein, John Griffin, and Enrique Lerner. *Id.*

[152] 845 A.2d 1031, 1033 (Del. 2004).

[153] *See, e.g.*, *El Paso Pipeline GP Co., L.L.C. v. Brinkerhoff*, 152 A.3d 1248, 1251 (Del. 2016) (noting that "the traditional rule [is] that dilution claims are classically derivative"); *Feldman v. Cutaia*, 956 A.2d 644, 655 (Del. Ch. 2007) ("A claim for wrongful equity dilution is premised on the notion that the corporation, by issuing additional equity for insufficient consideration, made the complaining stockholder's stake less valuable. Equity dilution claims are typically viewed as derivative under Delaware law"), *aff'd*, 951 A.2d 727 (Del. 2008).

injury "falls upon all shareholders equally and falls only upon the individual shareholder in relation to his proportionate share of stock as a result of the direct injury being done to the corporation."[154]

The Trust argues that its proposed Dilution Claim is not futile on the theory that it falls within the transactional paradigm recognized in *Gentile v. Rossette*.[155] There, our Supreme Court held that a claim for improper dilution could be both direct and derivative when:

> (1) a *stockholder having majority or effective control* causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders.[156]

As the above quotation makes clear, the *Gentile* paradigm only applies when a stockholder *already possessing majority or effective control* causes the corporation to issue more shares to it for inadequate consideration.[157] That paradigm does not

---

[154] *In re Berkshire Realty Co., Inc.*, 2002 WL 31888345, at *4 (Del. Ch. Dec. 18, 2002).

[155] 906 A.2d 91 (Del. 2006).

[156] *Id.* at 100 (citation omitted and emphasis added). The viability of this doctrine has been called into doubt. As Chief Justice Strine commented in his concurrence in *El Paso Pipeline*, "*Gentile* cannot be reconciled with the strong weight of our precedent" that "a claim that an entity has issued equity in exchange for inadequate consideration—a so-called dilution claim—is a quintessential example of a derivative claim." 152 A.3d at 1265-66 (citation omitted).

[157] *See El Paso Pipeline*, 152 A.3d at 1265-66 (Strine, C.J., concurring) (citation omitted and emphasis in original) ("*Gentile* purported to recognize a direct dilution claim when

43

apply here because, as the Trust concedes, there was no controller (or control group) in place at DAVA before the alleged improper dilution.[158]

A merger generally extinguishes a plaintiff's standing to maintain a derivative suit,[159] "since a derivative claim is a property right owned by the nominal corporate defendant [that] flows to the acquiring corporation by operation of a merger."[160] Delaware law recognizes two circumstances where a merger would not extinguish a stockholder's standing to maintain a derivative claim,[161] but neither is present here, as the Trust concedes.[162] Thus, because the proposed Dilution Claim is derivative

---

additional equity was issued to a company's CEO who was *already* the controlling stockholder. The reasoning was that this diminution in the voting power of minority stockholders somehow gave rise to a direct injury even though they were already stockholders in a controlled company."); *Carr v. New Enter. Assocs., Inc.*. 2018 WL 1472336, at *9 (Del. Ch. Mar. 26, 2018) (rejecting plaintiff's "invocation of *Gentile* to characterize as direct his claims . . . because the Complaint is devoid of any well-pled facts supporting the assertion that there was a controlling stockholder at the time of [the] transaction"); *Feldman*, 956 A.2d at 657 (citations omitted) ("*Gentile* and *Gatz* are predicated on the idea that transactions of this type result in an improper transfer of both economic value and voting power from the minority to the controlling stockholder. Thus, it is clear from those decisions that the Delaware Supreme Court intended to confine the scope of its rulings to only those situations where a controlling stockholder exists.").

[158] Tr. 103-04 (Sept. 7, 2017); *see also* Mot. to Amend. Ex. A ¶ 19 (emphasis added) ("Thus, the new Lenders were *granted* control of DAVA as a result of the Dilution.").

[159] *Lewis v. Anderson*, 477 A.2d 1040, 1049 (Del. 1984).

[160] *Feldman*, 951 A.2d at 731 (citing *Lewis*, 477 A.2d at 1044).

[161] *See Lewis*, 477 A.2d at 1046 n.10 (citation omitted) ("The two recognized exceptions to the rule are: (1) where the merger itself is the subject of a claim of fraud; and (2) where the merger is in reality a reorganization which does not affect plaintiff's ownership of the business enterprise.").

[162] Tr. 107-08 (Sept. 7, 2017).

and the Trust's standing to assert such a claim was extinguished by the Merger, it would be futile to grant leave to amend Count II to add the proposed Dilution Claim.

It likewise would be futile to grant leave to amend Count II to add allegations that the Notice improperly failed to disclose information relating to the issuance of the Warrants and the Stock Options for essentially two independent reasons. First, the gravamen of Count II of the Amended Complaint is that the Director Defendants breached their fiduciary duty as directors by failing to disclose material information. As explained above, the Director Defendants are entitled to summary judgment on this claim because (i) they are exculpated from monetary liability for breaches of the duty of care, (ii) their actions with respect to the contents of the Notice did not amount to bad faith because they reasonably relied on their outside corporate counsel (Dechert) to prepare the Notice in accordance with the requirements of Delaware law, and (iii) they are shielded from liability under Section 141(e) based on their reasonable reliance on Dechert.[163] These same reasons would apply with equal force to Count II if it were amended to include allegations about another category of information that allegedly was not disclosed in the Notice, *i.e.*, information about the issuance of the Warrants and Stock Options. Accordingly, it would be futile to amend Count II to add these allegations.

---

[163] *See supra* III.C.

Second, the omission of information concerning the issuance of the Warrants and Stock Options would not be material to a DAVA stockholder's decision whether to approve the Merger or seek appraisal. "Corporate fiduciaries can breach their duty of disclosure under Delaware law . . . by making a materially false statement, by omitting a material fact, or by making a partial disclosure that is materially misleading."[164] "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[165] As previously explained, the issuance of the Warrants and Stock Options were separate transactions that were unrelated to the Merger.[166] Thus, information about those issuances might be relevant to deciding whether to assert a claim for improper dilution, but logically would have no impact on a stockholder's decision regarding whether to accept the Merger consideration or seek appraisal.[167] For this reason as well, it would be futile to amend Count II to add allegations concerning the failure

---

[164] *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) (citation and internal quotations omitted).

[165] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994) (citation omitted).

[166] *See supra* III.C.1.

[167] *See In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 376 (Del. Ch. 1998) (citation omitted and emphasis in original) ("[T]he relevant inquiry is whether shareholders are misled as to the corporation's significant prospects (*i.e.*, material facts), and it is *not* a question of whether or not there was an ambiguity or misstatement that might lead shareholders to an incorrect conclusion about an insignificant or irrelevant fact which has no bearing on any other material facts.").

to disclose in the Notice information about the issuance of the Warrants and Stock

Options.[168]

[168] The Trust contends that, through the operation of 8 *Del. C.* § 262(d)(2), the corporation surviving the merger, in addition to DAVA's board of directors, owes a duty to disclose all material information to its stockholders so that they can make an informed decision whether to seek appraisal. *See* Dkt. 172, 184. According to the Trust, "[t]here is no logical, legal or equitable basis for finding that a 'sufficient' notice provided by a corporation through action of its directors must include financial, trading and pricing information, but that the *corporation's* obligation to provide notice under Section 262(d)(2) does not require this 'material' information." Dkt. 184 at 5 (emphasis in original). Thus, according to the Trust, a quasi-appraisal remedy can be sought against DAVA Pharmaceuticals LLC, the entity into which DAVA was converted post-Merger, because DAVA purportedly breached its statutory notice obligations under Section 262(d)(2). *Id.* at 14-16. Defendants argue in response that (i) the plain terms of Section 262(d)(2) do not impose such an obligation, and (ii) the disclosure requirements imposed on corporate fiduciaries under the common law are distinct from and independent of the more limited statutory requirements of disclosure that Section 262(d) imposes on the corporation (*i.e.*, to inform stockholders of a merger's approval and of their appraisal rights and to attach a copy of Section 262).

It appears to the court that defendants have the better argument given the "fundamental principle of Delaware law [of] . . . apply[ing] a statute in accordance with its plain meaning," *Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 376 (Del. Ch. 2004) (Strine, V.C.), *interlocutory appeal denied*, 871 A.2d 1128 (Del. 2004) (TABLE), and precedent drawing a distinction between disclosure required under the Delaware General Corporation Law and the common law. *See Berger*, 976 A.2d at 145 (acknowledging a distinction between a common law "breach of the duty of disclosure" and a "technical and non-prejudicial violation" of the Delaware General Corporation Law); *Gilliland*, 859 A.2d at 86 (noting that disclosure obligations are "two-fold" consisting of "a statutory duty to apprise the stockholders of their right to an appraisal, the effective date of the merger, and to provide a copy of Section 262" and "a common law fiduciary duty" to provide information material to the decision of whether to seek appraisal); *Nebel v. Sw. Bancorp, Inc.*, 1995 WL 405750, at *5-6 (Del. Ch. July 5, 1995) (viewing failure to comply with Section 262 as a *per se* violation of the duty of disclosure and separately analyzing the materiality of different omissions for common law disclosure claims). Because the Trust has not attempted to assert a claim against the successor entity under Section 262, however, the court expresses no definitive conclusion on this issue, which appears to be one of first impression.

**D.** **The Motion to Amend as to Proposed Count III is Granted in Part Because Amendment is not Necessarily Futile**

Count III of the proposed Second Amended Complaint asserts a claim for breach of fiduciary duty against Moezinia and Tepper in their capacity as officers of DAVA for "sending or allowing the Notice to be sent to the Cirillo Trust."[169] In support of its request for leave to add this claim, the Trust points out, correctly in my view, that (i) officers owe the same fiduciary duties to the corporation and its stockholders as directors;[170] (ii) the Section 102(b)(7) provision in DAVA's certificate of incorporation cannot exculpate officers from breaches of their duty of care and would not protect Moezinia and Tepper (notwithstanding their status as directors) from claims for breach of the duty of care while acting in their capacity as officers;[171] and (iii) Moezinia and Tepper would not be shielded from liability under Section 141(e) for actions they took as officers because the plain terms of that statute only shield directors, and not officers, from liability when they rely in good faith on

---

[169] Mot. to Amend Ex. A ¶ 71.

[170] *See Gantler v. Stephens*, 965 A.2d 695, 708-709 (Del. 2009) (citations omitted) ("In the past, we have implied that officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty, and that the fiduciary duties of officers are the same as those of directors. We now explicitly so hold.").

[171] *Id.* 965 at 709 n.37 ("Under 8 *Del. C.* § 102(b)(7), a corporation may adopt a provision in its certificate of incorporation exculpating its directors from monetary liability for an adjudicated breach of their duty of care. Although legislatively possible, there currently is no statutory provision authorizing comparable exculpation of corporate officers.").

outside experts.[172]  In other words, the Trust has identified a theoretical path to recovery through a due care claim against Moezinia and Tepper as officers where Sections 102(b)(7) and 141(e) would not apply.[173]

I am highly skeptical that the Trust ultimately could prevail on this due care theory given the factual record developed during discovery supporting the entry of summary judgment in the Directors Defendants' favor on Count II because they acted reasonably and in good faith in relying on Dechert to prepare the Notice.[174] Nevertheless, the odd procedural posture before the court,[175] where a motion to

---

[172] *See* 8 *Del. C.* § 141(e) (emphasis added) ("*A member of the board of directors . . .* shall, in the performance of such member's duties, be fully protected in relying in good faith upon," *inter alia*, the advice of experts).

[173] For the same reasons previously explained, however, any duty of loyalty claims asserted against Moezinia and Tepper as officers would be futile.  *See supra* III.C.1-2.

[174] *See San Antonio Fire & Police Pension Fund v. Amylin Pharma., Inc.*, 983 A.2d 304, 318 (Del. Ch. 2009) ("The board retained highly-qualified counsel.  It sought advice from [the company's] management and investment bankers as to the terms of the agreement.  It asked its counsel if there was anything 'unusual or not customary' in the terms of the Notes, and it was told there was not.  Only then did the board approve the issuance of the Notes under the Indenture.  This is not the sort of conduct generally imagined when considering the concept of gross negligence, typically defined as a substantial deviation from the standard of care.").

[175] It bears mentioning that defendants appear to be responsible for this odd procedural posture.  Defendants jumped the gun in filing a motion for summary judgment in the midst of fact discovery (which the court held in abeyance), and they apparently knew when they renewed that motion that the Trust intended to seek leave to amend its pleading. Defendants nevertheless insisted on moving forward with their motion rather than awaiting the filing of an amended pleading.  *See* Pl.'s Mot. for Summ. J. Answering Br. 3 n.5 (representing that "Plaintiff requested that [defendants await the filing of the Second Amended Complaint before filing their renewed motion for summary judgment], but defendants declined").

amend has been presented in tandem with a motion for summary judgment on plaintiff's prior pleading, compels me to grant the motion to amend with respect to the proposed Count III in a limited respect for two reasons.

First, the parallel claim against the directors (Count II of the Amended Complaint) previously survived a motion to dismiss—the operative standard for determining futility of an amendment—by stating a claim for breach of the duty of loyalty with respect to the preparation of the Notice. Allegations that were sufficient to state a claim that the Director Defendants acted in bad faith by failing to include material information in the Notice logically also would be sufficient to state a claim that Moezinia and Tepper were grossly negligent. Second, no briefing has been presented squarely addressing whether Moezinia and Tepper satisfied their due care obligations as officers with respect to the Notice. For these reasons, the motion to amend is granted with respect to proposed Count III, but only insofar as it seeks to assert a claim for breach of the duty of care against Moezinia and Tepper as officers.[176]

---

[176] Defendants argue that leave to amend should be denied with respect to proposed Count III on the ground of untimeliness. The statute of limitations for a breach of fiduciary duty claim is three years. 10 *Del. C.* § 8106. The motion to amend was filed in January 2017, within three years of the alleged breach, which occurred in July 2014. Applying the statute of limitations by analogy, the claim should not be time-barred in my view. *See Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 975 (Del. Ch. 2016) ("Statutes of limitations traditionally do not apply directly to actions in equity, although courts of equity may apply them by analogy in determining whether a plaintiff should be time-barred under the equitable doctrine of laches.").

**E. The Motion to Amend as to Proposed Count IV is Denied as Moot**

Count IV of the proposed Second Amended Complaint asserts a claim against Endo and DAVA SR LLC for failure to pay the Merger consideration. The motion to amend is denied as moot with respect to this claim because the Merger consideration has since been paid to the Trust.

## V. CONCLUSION

For the reasons explained above, defendants' motion for summary judgment is GRANTED in its entirety, and the Trust's motion to amend is GRANTED in part as to proposed Count III and DENIED as to proposed Counts I, II, and IV. The parties are directed to confer and to submit a form of implementing order within five business days of this decision.

**IT IS SO ORDERED.**